## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| ANDREW KLINE, DUSTY SHOWERS, LENA HUNA, and CHARLES MABRA, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BITCONNECT, BITCONNECT LTD, BITCONNECT INTERNATIONAL PLC, BITCONNECT TRADING LTD, GLENN ARCARO, RYAN MAASEN, JOSHUA JEPPESEN , AND JOHN DOES 1-20,<br><br>Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## NATURE OF THE ACTION

1.      Plaintiffs Andrew Kline, Dusty Showers, Lena Huna, and Charles Mabra ("Plaintiffs"), on behalf of themselves and as representative of the class defined herein, bring this action against the herein named relating to a putative cryptocurrency platform called BitConnect that has been revealed to have been a fraud.[1]

2.      BitConnect, BitConnect LTD, BitConnect International PLC and BitConnect Trading LTD (collectively "BitConnect") are all parts of the same foreign scam that conducts its business on the internet, principally by means of a website accessible at www.bitconnect.co.

---

[1].      All allegations contained herein are based upon personal information as to Plaintiff and the investigation of Plaintiff's counsel.  In particular, Plaintiff through his counsel has reviewed, among other things, public statements and media reports, and also had discussions with Bitconnect investors.

3.      BitConnect held itself out as "the cryptocurrency revolution"[2] purported to "[b]ulid trust and reputation in [a] bitcoin and cryptocurrency ecosystem with [an o]pen-source platform." On its website, BitConnect held itself out as an all-in-one crypto-community platform designed to provide multiple investment opportunities.

4.      Class members were advised that BitConnect was "[a] self regulated Financial system" and "an open source all in one bitcoin and crypto community platform designed to provide multiple investment opportunities with cryptocurrency education where it is entirely possible to find the independence we all desire, in a community of like-minded, freedom loving individuals who, like you, are seeking the possibility of income stability in a very unstable world."

5.      BitConnect created its own digital token called BitConnect Coin ("BCC"), for which its website represented:

> BitConnect Coin price is a perceived regard for its **supply and demand** features designed during Bitconnect coin algorithm. The future value of BitConnect Coin is a result of many aspects **coin supply mining** and **minting algorithm**, BitConnect community network, and its features. This guide discusses the most important factors that lead its users to consider BitConnect coin to be **valuable** as of now and in near future.

> **BCC Coin Specifications:**

> *Maximum coin supply:* 28 millions

> *Current available supply:* 6 millions

---

[2].      Cryptocurrencies are virtual coins or tokens created by companies or individuals. Bitcoin is an example of one such cryptocurrency, and there are more than one thousand other virtual coins or tokens currently in existence. Companies and individuals create cryptocurrencies and sell them to the public through initial coin offerings ("ICOs"). Virtual coins and tokens are primarily issued and distributed on a "blockchain" or a cryptographically-secured ledger which exists on the internet. Virtual coins and tokens are traded on online platforms, typically called cryptocurrency exchanges, and they can be traded for other digital assets or fiat currencies, such as the U.S. Dollar or Euro.

> *Fresh New supply:* Adding 23 million more via BCC mining (**2.6 million**) and BCC minting (**20.4 million**) over the time and its purely dependent on public demand.

6.    Of the 28 million BCC supposedly available, 20.4 million were reserved for issuance through "BCC Staking," for which Class members were promised high interest rates and were advised:

> The moment you acquire BitConnect Coin it becomes an interest bearing asset with Up to 120% return per year through PoS minting. All you have to do to earn with this method is to hold coins in your Bitconnect-QT wallet. This means anyone holding BitConnect Coin in their wallet will receive interest on their balance in return for helping maintain security of the network, Learn more to stake BitConnect Coin.

7.    BitConnect's false promises allowed its ecosystem to grow drastically. According to the State of Texas:

> The BitConnect Websites represent[ed], as of 11:15 am on January 3, 2018, more than 9.4 million out of a maximum of 28 million BitConnect Coins ha[d] been introduced into the market. They also represent[ed], as of the same time and date. the current price of a BitConnect Coin [wa]s approximately $436 per token, and the market capitalization of all BitConnect Coins [wa]s valued at more than $4.1 billion.

8.    BitConnect purported to offer investment opportunities that allow individuals to profit from 1) BitConnect's trading of digital tokens through a proprietary, secret automated trading system it calls its "volatility software," 2) its digital token, called BitConnect Coin, and 3) its referral program.

## JURISDICTION AND VENUE

9.    *Subject Matter Jurisdiction.*  This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and Plaintiffs and defendants are citizens of different states. The proposed Class and Subclasses each include well over 100 members.

10.     ***Personal Jurisdiction.***  This Court has personal jurisdiction over all Defendants because all Defendants solicited and transacted business within this District by seeking to and selling BCC within this District.  Defendants also expected or should reasonably have expected the acts complained of herein to have consequences in the state and Defendants derived substantial revenue from interstate and/or international commerce.

11.     ***Venue.***  Venue is proper in this District pursuant to 28 U.S.C. §1391 because Defendants are subject to this Court's personal jurisdiction, as alleged above. In addition, the causes of action arose, in substantial part, in this District.

## PARTIES

### Plaintiffs

12.     Plaintiff Andrew Kline lost money as a result of the scheme described herein. He is a resident of the state of Florida. Plaintiff Kline initially funded his BitConnect account on or about August 2017, through BitConnect's website.

13.     Plaintiff Dusty Showers lost money as a result of the scheme described herein. He is a resident of the state of Florida. Plaintiff Showers initially funded his BitConnect account on or about September 2017, through BitConnect's website.

14.     Plaintiff Lena Hunt lost money as a result of the scheme described herein. She is a resident of the state of Florida. Plaintiff Hunt initially funded her BitConnect account on or about October 2017, through BitConnect's website.

15.     Plaintiff Charles Mabra lost money as a result of the scheme described herein. He is a resident of the state of Rhode Island. Plaintiff Mabra initially funded his BitConnect account on or about December, 2017, through BitConnect's website.

**<u>Defendants</u>**

        (i)      Corporate Defendants

16.     BitConnect LTD is organized in England and Wales and is incorporated under the Companies Act 2006 as a private company limited by shares. BitConnect LTD represented that it maintains a registered address at The Panorama, Park Street, Ashford, United Kingdom TN24 8EZ.

17.     BitConnect International PLC is organized in England and Wales and is incorporated under the Companies Act 2006 as a public limited company. BitConnect International PLC represented that it maintains a registered address at Grant Thornton House, 22 Melton Street, Kings Cross, London, United Kingdom NW1 2EP.

18.     BitConnect Trading LTD is organized in England and Wales and is incorporated under the Companies Act 2006 as a private company limited by shares. BitConnect Trading LTD represented that it maintains a registered office address at 23 St. Elizabeth Avenue, Bootle, United Kingdom, L20 6FA.

19.     Upon information and belief, the BitConnect entities are wholly interrelated and are used interchangeably as instrumentalities for the fraud described herein

        (ii)     Individual Defendants

20.     Defendant Glenn Arcaro is an individual domiciled in Moorpark, California and is *sui juris.* According to paperwork filed with the corporate registry office in the United Kingdom, Defendant Arcaro is an active Director of BitConnect International PLC. Defendant Arcaro served BitConnect by managing a team of U.S.-based affiliates/recruiters. He also served as one of the most successful affiliate/recruiters for BitConnect, himself soliciting hundreds, if not thousands, of BitConnect investors in the United States and abroad through social media sites such as YouTube and Facebook.

21.    Defendant Ryan Maasen is an individual believed to be domiciled in Tulsa, Oklahoma and is *sui juris.* Defendant Maasen served as an affiliate/recruiter for BITCONNECT, soliciting hundreds if not thousands of BITCONNECT investors in the United States and abroad through social media sites such as YouTube and Facebook.

22.    Defendant Joshua Jeppesen is an individual believed to be domiciled in the United States and is *sui juris*. According to published information, Defendant Jeppesen held the title of a Director at BitConnect, serving as the Development Director for BitConnect's operations in the United States and Europe.

(iii)    Additional "John Doe Defendants"

23.    In addition to those alleged above, there are persons and entities, unknown to Plaintiffs, who furthered the scheme described herein.  Plaintiffs will amend their pleading to add such persons, called the "John Doe Defendants" herein, by amending this pleading at a later date.

## CLASS ACTION ALLEGATIONS

24.    Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23(b)(3), on behalf of themselves and all others similarly situated in the United States, who transferred currency or cryptocurrency to Bitconnect, in furtherance of Defendants' scheme, and lost money as a result thereof, at any time since its Initial Coin Offering on November 15, 2016 (the "Class"), the subset of such persons who are residents of, or transacted in, Florida (the "Florida Sub-Class") and the subset of such persons who are residents of, or transacted in, Rhode Island (the "Rhode Island Sub-Class").

25.    Plaintiffs also brings Counts below on behalf of a subclasses of Florida and Rhode Island residents who transferred currency or cryptocurrency to Bitconnect, in furtherance of Defendants' scheme, and lost money as a result thereof, at any time since its Initial Coin Offering on November 15, 2016 (the "Subclasses").

26.     The Class and Subclasses do not include Defendants' officers, agents, employees, or affiliates.

27.     The Class and Subclasses consist of potentially millions of persons who lost money as a result of Defendants' scheme. While the exact number of members of the Class and Subclasses and the identities of individual members of the Class and Subclass are unknown to Plaintiffs' counsel at this time, and can only be ascertained through appropriate discovery, based on the fact that several billion dollars worth of purported market capitalization were destroyed, the membership of the Class and Subclass are each so numerous that joinder of all members is impracticable.

28.     Defendants' wrongful conduct affected all members of the Class and Subclass in exactly the same way. Defendants' scheme caused Class members to transfer currency or cryptocurrency to Bitconnect, caused those Class members to lose money.

29.     Questions of law and fact common to all members of the Class and Subclasses predominate over any questions affecting only individual members. Such common questions of law and fact include:

      a.     whether Defendant's conduct violated state and federal securities laws;

      b.     whether Defendant's conduct was illegal;

      c.     whether Defendants were unjustly enriched;

      d.     whether the Plaintiffs and the other members of the Class and Subclasses have been damaged, and, if so, what is the appropriate relief; and

      e.     whether Plaintiffs and the Class have sustained damages as a result of Defendants' conduct.

30.     Plaintiffs' claims, as described herein, are typical of the claims of all other members of the Class and Subclasses, as the claims of the Plaintiffs and all other members of the Class and Subclasses arise from the same set of facts regarding the Defendants' scheme. Plaintiffs maintain no interest antagonistic to the interests of other members of the Class or Subclasses.

31.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions of this type. Accordingly, the Plaintiffs are adequate representatives of the Class and Subclasses and will fairly and adequately protect their interests.

32.     This class action is a fair and efficient method of adjudicating the claims of the Plaintiffs and the Class and Subclasses for the following reasons:

     a.     common questions of law and fact predominate over any question affecting any individual Class and Subclasses' members;

     b.     the prosecution of separate actions by individual Class and Subclasses' members would likely create a risk of inconsistent or varying adjudications with respect to individual members thereby establishing incompatible standards of conduct for Defendant or would allow some Class and Subclasses' members' claims to adversely affect the ability of other members to protect their interests;

     c.     this forum is appropriate for litigation of this action since Defendants solicited and transacted business within this District by seeking to and selling BCC within this District, and because Defendants expected or should reasonably have expected the acts complained of herein to have consequences in the state and Defendants derived substantial revenue from interstate and/or international commerce;

      d.     Plaintiffs anticipate no difficulty in the management of this litigation as a class action; and,

      e.     the Class and Subclasses are readily definable, and prosecution as a class action will eliminate the possibility of repetitious litigation, while also providing redress for claims that may be too small to support the expense of individual, complex litigation.

33.     For these reasons, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**FACTS BEARING UPON DEFENDANTS' FIDUCIARY BREACHES**

34.     Just a month prior to collapsing, BitConnect was guaranteeing returns of up to 40 percent per month.

35.     After receiving cease-and-desist orders from authorities in North Carolina and Texas, BCC coin lost more than 90 percent of its value.

36.     Despite boasting about its financial solvency and guaranteed returns, investors have been left with no way to withdraw their funds.

37.     Where there's smoke there's fire – here, it's clear that BitConnect made a final predatory push to grab as many investor funds as possible before closing up shop.

38.     BitConnect uses cryptocurrency as a cover for running its Ponzi scheme. For example:

      a.     It provides daily interest on an investment that has no income other than new investor money;

      b.     It artificially increases the value of its cryptocurrency by having new investors in the Ponzi scheme purchase BCC before investing;

      c.     It hides the identity of the owners of this scam by using an offshore company created through a company called Companies Made Simple; and,

d.      It expands the amount of people in this Ponzi scheme by offering a recruiting program that pays a commission 7-levels deep for recruits.

39.     BitConnect represented on its website, www.bitconnect.co, that as of 3:45 pm EST on January 6, 2018, more than 9.4 million out of a maximum of 28 million BitConnect Coins had been introduced into the market. It also represented, as of the same time and date, the current price of BCC was approximately $440 per token, and the market capitalization of all BitConnect Coins was currently valued at more than $4.1 billion.

40.     As of January 31, 2018, BCC's market value has dwindled to a value of $8.14.

41.     BitConnect lured investors by claiming that investors can "begin staking or holding BitConnect Coin and watch [their] interest grow," and that "the more [investors] hold, the more [they] earn."

42.     Specifically, BitConnect represents that:

a.      BitConnect Coin is "the investment tool [investors] need to jump start [their] financial security;"

b.      Investors can "[s]ecure [their] future by gaining quick profit growth for tomorrow that is practical and attainable;"

c.      Investment in BCC ensures "financial freedom is available and [investors] can start today. Store and invest wealth and earn substantial interest and investment;" and

d.      Investors who purchase BCC are purchasing "an interest bearing asset with 120% return per year. It is that simple."

43.     BitConnect purports to offer investment opportunities that allow individuals to profit from: 1) BitConnect's trading of digital tokens through a proprietary, secret automated

trading system it calls its "volatility software;" 2) its digital token, called BitConnect Coin; and 3) its referral program.

44.     The BitConnect investments, as described below, are the BitConnect Lending Program and the BitConnect Staking Program.

45.     With regard to the "BitConnect Lending Program," BitConnect represents that investors will earn up to 40% interest per month over a specified term and an additional rate of interest calculated on a daily basis. BitConnect claims the interest is earned through the profits generated by its proprietary, secret trading system that it calls its "volatility software."

46.     BitConnect publishes statements on its website that suggest that investors are guaranteed the return of their principal investment in as soon as 120 days.

47.     In the BitConnect Lending Program, investors must first acquire Bitcoin. BitConnect then directs investors to deposit their Bitcoin into the BitConnect BCC Exchange platform. Once deposited, BitConnect instructs investors to sell their Bitcoin to BitConnect in exchange for BCC. Investors then "lend" their BCC back to BitConnect, and BitConnect claims to use the BCC that it borrows to fund the trading activities of a proprietary, secret trading system that it calls its "volatility software."

48.     BitConnect touts this investment as a "safe way to earn a high rate of return on. . . investment[s] without having to undergo a significant amount of risk."

49.     BitConnect displays the chart below to confer the impression that the returns from the BitConnect Lending Program are guaranteed, and that investors will earn interest and return of the principal capital invested within a set period of time:

**BitConnect Coin Lending Profits Interest**

| Lending Amount | Interest (Accrued Daily) | Capital Back |
|---|---|---|
| $100 - $1000 | Volatility Software Interest (up to 40 % Per Month) | After 299 Days |
| $1010 - $5000 | Volatility Software Interest + 0.10% Daily (up to 40 % Per Month) | After 239 Days |
| $5010 - $10000 | Volatility Software Interest + 0.20% Daily (up to 40 % Per Month) | After 179 Days |
| $10010 - $100000 | Volatility Software Interest + 0.25% Daily (up to 40 % Per Month) | After 120 Days |

50.     BitConnect represents that investors in its "BitConnect Staking Program" will earn interest of up to 10% per month over a specified term. BitConnect states the interest is earned through "Proof of Stake Minting." BitConnect claims that "Proof of Stake Minting" is a process in which rewards are distributed to those "helping maintain the security of the network via proof of holding."

51.     In the BitConnect Staking Program, investors must first acquire Bitcoin. BitConnect then directs investors to deposit their Bitcoin into the BitConnect BCC Exchange platform. Once deposited, BitConnect instructs investors to sell their Bitcoin to BitConnect in exchange for BCC. Investors must then download and install the BitConnect-QT wallet software onto their computer and hold the BCC tokens in the BitConnect-QT wallet for more than fifteen days. The interest that BitConnect pays to investors is based on the amount of BCC, or "stake," investors hold in the BitConnect-QT wallets which is installed on the investors' computers.

52.     The amount of interest paid to investors is contingent upon the dates of the investors' investment.

53.     BitConnect provides the below chart to demonstrate the purported guaranteed rate of return from the BitConnect Staking Program:

| Duration | Interest |
|---|---|
| 1st 6 months Jan 2017 to June 2017 | 60% (10%per month) |
| 2nd 6 months July 2017 to Dec 2017 | 50% (8%per month) |
| 3rd 6 months Jan 2018 to June 2018 | 40% (7%per month) |
| 4th 6 months July 2018 to Dec 2018 | 30% (5%per month) |
| 5th 6 months Jan 2019 to June 2019 | 20% (3%per month) |
| 6th 6 months July 2019 to Dec 2019 | 10% (1.4%per month) |

54.     In addition to the representations described above, BitConnect made the following statements on its website:

      a.    "You can invest BitConnect coin in BitConnect lending platform exclusively from the BitConnect Dashboard. This investment option involves profiting from BitConnect trading bot and volatility software. You will receive daily profit based on your investment option;"

      b.    "Upon investment term completion, you will receive your CAPITAL BACK to take out from the BitConnect lending platform or optionally reinvest back in lending platform to continue receiving daily profit;" and,

      c.    "It takes 15 days to mature your coin from last received interest block. Once you received interest block in your staking wallet, you are required to wait for another 15 days to find next interest block."

55.     BitConnect provides a Daily Interest Chart on its website that shows the daily interest that is purports to have paid to investors in the three months leading to January 5, 2018. Notably, this interest was paid in BCC, which Defendants could issue freely but which could dilute the value of outstanding BCC. This chart shows no days of negative returns and it appears to show an average daily interest rate of around 1%:



56.     An average daily interest rate of around 1% compounds to an annual compounded investment return of over 3,000%. Annual compounded investment returns of over 3,000% are extremely unusual in financial markets, and risk-free annual compounded investment returns of over 3,000% are non-existent.

57.     Guaranteed annual compounded investment returns of over 3,000% are a known "red-flag" for fraud, specifically for the risk that the investment may be a "Ponzi scheme." By way of comparison, as of February 1, 2018, Apple has returned 3,000% since May of 2005, over two years before the iPhone was introduced.

58.     Plaintiffs and other members of the Class believed, based on BitConnect's statements in its promotional materials, that investors would profit by merely holding and staking BCC tokens, enjoying the guaranteed returns provided by BitConnect's proprietary "volatility software."

59.     Further, Plaintiffs and other members of the Class expected that BitConnect and its agents would expend significant efforts to continue to develop the proprietary "volatility software," and that such development would increase the value of their BitConnect Coin tokens.

60.    BitConnect states that "Investing on BitConnect platform . . . is a *safe* way to earn a high rate of return on your investment without having to undergo a significant amount of risk." (emphasis added).   BitConnect also claims to investors that "[t]he interest rate that we can *guarantee* on your investment while using our investment platform is calculated by our BitConnect Price Volatility Software and accrued daily." (emphasis added).   Based on these statements, investors believed they would profit solely from the essential managerial efforts of BitConnect.

61.    Despite offering these financial projections and representations concerning the solvency of BCC, BitConnect has not registered any offerings of securities, or filed either claims for exemption from securities registration or notice filings with respect to securities covered under federal law, as required by law.

62.    BitConnect offers these investments to the general public, including residents of Florida, through its websites and its sales people, which it calls "affiliates." BitConnect's conduct related to the offers and sales of the investments to the general conduct is willful.

63.    BitConnect's websites are accessible worldwide to the general public. The BitConnect investments are available for purchase by individuals in the United States and worldwide through the BitConnect's websites and affiliated websites rendered in foreign languages. The investments are promoted on social media pages including, but not limited to, Facebook, YouTube, Reddit, Instagram and Craigslist.

64.    BitConnect promotes its investments on the BitConnect's websites by making the following representations:

    a.    "There are multiple ways to invest in the BitConnect platform with different level of earning opportunity associated;"

b.      "You can invest BitConnect Coin in BitConnect lending platform exclusively from the BitConnect Dashboard. This investment option involves profiting from BitConnect trading bot and volatility software. You will receive daily profit based on your investment option. Upon investment term completion, you will receive your capital back to take out from the BitConnect lending platform or optionally reinvest back in lending platform to continue receiving daily profit;"

c.      "Invest your wealth in community driven decentralized cryptocurrency. Using BitConnect public exchange, you can buy, sell and trade BitConnect Coin (BCC) directly to and from each other with no central organization involved."

65.      BitConnect encourages affiliates to promote BitConnect investments through social media, blogs, videos, websites and newsletters by means of a referral, or commission program. BitConnect creates marketing material which is used by affiliates, including music videos, cartoons and online presentations that describe BCC tokens, the BitConnect Lending Program and the BitConnect Staking Program.

66.      Investors use the referral link to access BitConnect's websites and purchase BitConnect investments. The referral link ensures the affiliate is credited with commissions according to the BitConnect Referral Program.

67.      In the BitConnect Referral Program, BitConnect pays commissions to affiliates who use referral links to offer and sell BCC. The value of the commissions is based on the affiliate's placement in a multi-level matrix of other affiliates and it can range from two percent

to five percent of the amount invested. These commissions are paid to affiliates in Bitcoin. The commission matrix was changed by BitConnect in November 2017.

68.    BitConnect promotes its referral program by representing that:

a.    "BitConnect offering [sic] a lucrative bonus program which enables you to earn affiliate commission if your referral invest in BitConnect lending;"

b.    "At the same time, generate a serious income for yourself through our bitcoin affiliate program. You can start earning your free bitcoins today for every person you refer and who starts lending on BitConnect platform;"

c.    "As a means to spread the word, help grow our community, and offer you a great way to earn free Bitcoins, we are now offering a lucrative bonus program which enables you to earn bitcoin for every new user who signs up and lends BitConnect Coin (BCC) to our lending platform using your affiliate link;"

d.    "BitConnect's referral program is designed to provide 3 Levels of earning potential to you based on the number of lenders. You will earn a commission every time your referral lends BitConnect Coin(BCC) on our platform. Invite your friends and family to join BitConnect via your unique referral link to start earning a serious income from our bitcoin affiliate program;" and,

e.    "Spread the word on social media and other online platforms to help making [sic] BitConnect platform a success for the entire community of lenders."

69.     BitConnect willfully and fraudulently fails to disclose material facts when offering the BitConnect investments, including, but not limited to, the following:

a.     The identity of the principals of BitConnect and the true location of BitConnect's operations and management;

b.     Information about the assets and liabilities of BitConnect and any other information that indicates the means by which BitConnect will provide investors with a guaranteed daily return, regardless of the value of Bitcoin;

c.     Information about the proprietary, secret trading system that it calls its "volatility software," details of its trading records and historical performance, proof of its existence, and the risk factors associated with its use;

d.     That the BitConnect investments are securities and are not registered with any governing regulator;

e.     That only registered dealers or agents can be paid commissions for referrals or sales of securities; and

f.     That affiliates who receive such commissions for their sale of BitConnect investments without being properly registered are in violation of the Securities Act.

70.     The solicitation of the investing public poses an immediate and significant danger to the Class and the public welfare because:

a.     the securities (the BitConnect investments) offered have not been registered. Proper registration of securities is an essential safeguard serving to require companies to provide accurate and material information

to enable investors to make reasoned investment decisions and to protect the public from fraud;

b.    BitConnect has not registered as dealer in, or salesman of, securities. The registration of dealers and salesmen, as required by the Securities Act, ensures that persons transacting business as securities dealers and salesmen are competent, honest, properly regulated and authorized to do so;

c.    The current speculative activity associated with cryptocurrencies makes investors particularly susceptible to investing without performing their normal due diligence. Further, most cryptocurrency exchanges are unregulated markets and therefore vulnerable for manipulative trading, fraud and deception;

d.    BitConnect has omitted material facts in its offerings and has made misrepresentations which make the BitConnect investments particularly dangerous for the investing public. Further, BitConnect is encouraging members of the investing public to become its affiliates and therefore to act as unregistered dealers and/salesmen in violation of the Securities Act; and,

e.    BitConnect's marketing materials are disproportionally targeted towards children, young adults, persons of limited financial means, and unsophisticated investors who may not be able to sustain a complete loss of their investment without enduring significant financial hardship; and,

      f.     BitConnect states that it is about to solicit investment in a newly created token, known as BitConnectx, in an ICO. BitConnect indicates the BitConnectx ICO will begin on or around January 10, 2018.

71.     Even after State regulators began to expose BitConnect's Ponzi scheme, rather than owning up to their misdeeds, BitConnect continues to change their story.

72.     For example, on January 16, 2018, BitConnect announced that it halted its lending and exchange platform because of "continuous bad press," "cease and desist letters," and "DDos attacks."

73.     Then a day later on January 17, 2018, BitConnect announced that it was making changes to its lending and exchange functions, and that the "current BCC price drop is the direct result of [BitConnect] releasing all of [its] members coins at one time," but that it "would do [it's] best to honor the value of BCC as close to what it has been holding during past several months."

74.     Shockingly, it announced that: "For next 10 days we are allowing members outside the U.S.A, to participate in the BitConnect X ICO with BCC at $150. This is *to support existing coin holders and give the BCC coin some initial stability after these recent events*." (emphasis added).   After receiving funds from non-U.S. investors, BitConnect "expect[s] BitConnect coin (BCC) to gain its value back." This text book Ponzi scheme behavior evidences that BitConnect continues to "rob Peter to pay Paul."

75.     On January 18, 2018, @BitConnect tweeted: "We still expect BitConnect coin (BCC) to gain its value back and you can hold your coins in the website wallet or transfer them to a QT wallet. We are still supporting BCC to gain its value back. @bitconnect[.]"

76.     It is clear there is no income other than new investor money to produce their daily profits. This is a textbook Ponzi scheme. BitConnect artificially increase the value of the BitConnect Coin by having people exchange their Bitcoin for BCC and then have them invest in the Ponzi scheme lending program.

77.     To expand the amount of people in this scam, BitConnect has a recruiting program where they provide 7-Levels of earning potential based on the number of people recruited. BitConnect states you earn a commission every time your referral lends BCC, and the commission is based on the tier you have achieved in their referral program as shown below:

| Level | Referral Bonus |
|-------|----------------|
| Level 1 | 7 % |
| Level 2 | 3 % |
| Level 3 | 1 % |
| Level 4 | 1 % |
| Level 5 | 0.5 % |
| Level 6 | 0.3 % |
| Level 7 | 0.2 % |

78.     BitConnect exemplifies the characteristics commonly found in a Ponzi scheme, including but not limited to, claims of high investment returns with little or no risk, overly consistent returns, unregistered investment, unlicensed sellers, secretive and/or complex strategies, issues with paperwork, and difficulty receiving payments.

## COUNT I

## VIOLATION OF SECTIONS 5 AND 12(A)(1) OF THE 1933 ACT

### (Against All Defendants)

79.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs 1 through 78 of this Complaint, except any allegation of fraud, recklessness or intentional misconduct.

80.    This Count is brought pursuant to Sections 5 and 12(a)(1) of the 1933 Act, 15 U.S.C. §§ 77e and 77l(a)(1), on behalf of the Class, against Defendants.

81.    BitConnect Coin are securities within the meaning of 15 U.S.C. § 77b(a)(1).

82.    Defendants named in this Count I, and each of them, promoted, offered and/or sold securities through the ICO.

83.    Defendants, and each of them, are issuers, underwriters, and/or necessary participants of the ICO.

84.    No Defendant or other person registered the BitConnect Coin or the ICO with the SEC.

85.    Defendants, and each of them, used the instrumentalities of interstate commerce in connection with the offer and sale of BitConnect Coin securities.

## COUNT II

## VIOLATION OF SECTION 15 OF THE 1933 ACT

### (Against All Defendants)

86.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs 1 through 78 of this Complaint, except any allegation of fraud, recklessness or intentional misconduct.

87.     This Count is asserted against Defendants based on Section 15 of the 1933 Act, 15 U.S.C. § 77(o).

88.     Defendants, by virtue of their offices, stock ownership, agency, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling person primary violators within the meaning of Section 15 of the 1933 Act. Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of BCC securities as described herein.

89.     Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of BitConnect.

90.     Defendants, separately or together, have sufficient influence to have caused BitConnect to submit a registration statement.

91.     Defendants, separately or together, jointly participated, and/or aided and abetted BitConnect's failure to register the ICO.

92.     By virtue of the conduct alleged herein, Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

## COUNT III

## FRAUD IN THE PURCHASE OR SALE OF SECURITIES IN VIOLATION OF 17(A)(2) AND 17(A)(3) OF THE EXCHANGE ACT

### (Against All Defendants)

93.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs 1 through 78 of this Complaint.

94.     BCC constitute investment contracts, and thus "securities" under 15 U.S.C. § 78c(a)(10).

95.    Defendants, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants engaged in a fraudulent course of conduct by which they oversold the investment returns from their virtual currency mining operation and misrepresented the nature and profitability of the investments they were selling.

96.    By engaging in the conduct described above, these defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities have employed or are employing devices, schemes or artifices to defraud; and have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

97.    By engaging in the conduct described above, these defendants directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, have made or are making untrue statements of material fact or have omitted or are omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

98.    By engaging in the conduct described above, these defendants knowingly conspired to bring securities onto the market that were not entitled to be marketed and which, absent the fraud, would not have been marketable at any price.

99.     Plaintiffs relied on, among other things, the securities' availability in the market as an indication of their apparent genuineness and suffered damages as a result.

100.    As a result, Defendants have violated Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and (3).

## COUNT IV

## CONTROLLING PERSON LIABILITY PURSUANT TO SECTION 20(a) OF THE EXCHANGE ACT

### (Against All Defendants)

101.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs 1 through 78 of this Complaint.

102.    Defendant Jeppesen and certain of the John Doe Defendants, by virtue of their positions, were controlling persons of BitConnect within the meaning of Section 20(a) of the Exchange Act.

103.    Defendant Jeppesen and certain of the John Doe Defendants possessed the power to direct or cause the direction of the management and policies of BitConnect, and was a culpable participant in the scheme to artificially inflate BCC.

104.    As a direct and proximate result of Defendant Jeppesen and certain of the John Doe Defendants' conduct, plaintiffs suffered damages

105.    By engaging in the conduct described above, these defendants knowingly conspired to bring securities onto the market that were not entitled to be marketed and which, absent the fraud, would not have been marketable at any price.

106.    Plaintiffs relied on, among other things, the securities' availability in the market as an indication of their apparent genuineness and suffered damages as a result.

107.    As a result, Defendant Jeppesen and certain of the John Doe Defendants have violated Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

### COUNT V

### COMMON LAW FRAUD

### (Against All Defendants)

108.    Plaintiffs repeat and incorporate by reference the preceding allegations in paragraphs 1 through 78 of this Complaint as if set forth fully herein.

109.    Defendants engaged in a fraudulent scheme in which they made the false statements of material fact described above to induce customers to purchase BCC.

110.    The defendants knew or were reckless in not knowing that the statements were false when the statements were made.

111.    Plaintiffs relied on defendants' false statements in deciding to purchase BCC and suffered damages as a result.

### COUNT VI

### AIDING AND ABETTING COMMON LAW FRAUD

### (Against All Defendants)

112.    Plaintiffs repeat and incorporate by reference the preceding allegations in paragraphs 1 through 78 of this Complaint as if set forth fully herein.

113.    Defendants aided and abetted other the Defendants' (named in Count V) fraudulent scheme to sell BCC by making false statements of fact about the quality and nature of the investments.

114.    Defendants named herein were kept apprised of the BitConnect's status, and had the power to direct and control the policies and management of the companies.

115.    Defendants named herein knew or was reckless in not knowing that BitConnect's statements were false, and he knowingly provided substantial assistance to the Defendants' (named in Count V) in order to perpetuate their fraudulent scheme.

<u>**COUNT VII**</u>

<u>**VIOLATION OF FLORIDA'S UNFAIR TRADE PRACTICES ACT, FLA. STAT. §
501.201, *ET SEQ.***</u>

<u>**(Against All Defendants On Behalf Of Plaintiffs Kline, Showers and Hunt and the Separate
Florida Subclass)**</u>

116.    Plaintiffs Kline, Showers and Hunt repeat and incorporate by reference the preceding allegations in paragraphs 1 through 78 of this Complaint as if set forth fully herein.

117.    This claim is brought by Plaintiffs Kline, Showers and Hunt on behalf of the Florida Sub-Class.

118.    At all relevant times, Plaintiffs Kline, Showers and Hunt and Florida Sub-Class members were "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA").

119.    BitConnect engaged in trade and commerce in Florida.

120.    As alleged herein this Complaint, BitConnect engaged in unfair or deceptive acts or practices in the conduct of consumer transactions, in violation of the FDUTPA by intentionally and/or knowingly misrepresenting the true nature of investment in BCC.

121.    As a direct and proximate result of Defendants' violation of the FDUTPA, Plaintiffs Kline, Showers and Hunt and other members of the Florida Sub-Class suffered damages.

122.    Plaintiffs Kline, Showers and Hunt bring this action on behalf of themselves and other members of the Florida Sub-Class for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow

consumers to make informed purchasing decisions and to protect Plaintiffs and other members of the Florida Sub-Class and the public from BitConnect's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and unlawful practices. BitConnect's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

123.    Plaintiffs Kline, Showers and Hunt and other members of the Florida Sub-Class seek actual damages under Fla. Stat. § 501.211(2) and all fees, costs, and expenses allowed by law, including attorney's fees and costs, pursuant to Federal Rule of Civil Procedure 23 and Fla. Stat. §§ 501.2105 and 501.211, to be proven at trial.

## COUNT IIX

## VIOLATION OF FLORIDA SECURITIES LAWS

### (Against All Defendants On Behalf Of Plaintiffs Kline, Showers and Hunt and the Separate Florida Subclass)

124.    Plaintiffs Kline, Showers and Hunt repeat and incorporate by reference the preceding allegations in paragraphs 1 through 78 of this Complaint as if set forth fully herein.

125.    Defendants violated the Florida Securities and Investor Protection Act, Fla. Stat. §§ 517.011, *et seq.*, through their actions detailed above, by, inter alia, making false representations and by selling unregistered securities.

126.    As a result of the violation of the Florida Securities and Investor Protection Act, Plaintiffs and the Class lost money in investments that they otherwise would not have made had they known the truth.

## COUNT IX

### VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT (R.I. GEN. LAWS § 6-13.1 ET SEQ.)

### (Against All Defendants On Behalf Of Plaintiff Mabra and the Separate Rhode Island Subclass)

127.   Plaintiff Mabra repeats and incorporates by reference the preceding allegations in paragraphs 1 through 78 of this Complaint as if set forth fully herein.

128.   This claim is brought by Plaintiff Mabra on behalf of the Rhode Island Sub-Class.

129.   Rhode Island's Unfair Trade Practices and Consumer Protection Act (the "Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce," including "[e]ngaging in any act or practice that is unfair or deceptive to the consumer" and "[u]sing any other methods, acts or practices which mislead or deceive members of the public in a material respect." R.I. GEN. LAWS § 6-13.1-1(6).

130.   Defendants, Plaintiff Mabra and members of the Rhode Island Sub-Class are "persons" within the meaning of R.I. GEN. LAWS § 6-13.1-1(3).

131.   Defendants were engaged in "trade" and "commerce" within the meaning of R.I. GEN. LAWS § 6-13.1-1(5).

132.   Plaintiffs purchased or leased Polluting Vehicles primarily for personal, family, or household purposes within the meaning of R.I. GEN. LAWS § 6-13.1-5.2(a).

133.   Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to R.I. GEN. LAWS § 6-13.1-5.2(a).

134.   Plaintiffs also seek punitive damages at the discretion of the Court.

## COUNT X

## VIOLATION OF RHODE ISLAND SECURITIES LAWS

### (Against All Defendants On Behalf Of Plaintiff Mabra and the Separate Rhode Island Subclass)

135.    Plaintiff Mabra repeats and incorporates by reference the preceding allegations in paragraphs 1 through 78 of this Complaint as if set forth fully herein.

136.    Defendants violated the Rhode Island Uniform Securities Act, R.I. Gen. Laws 7-11, through their actions detailed above, by, inter alia, making false representations and by selling unregistered securities.

137.    As a result of the violation of the Rhode Island Uniform Securities Act, Plaintiff and the Class lost money in investments that they otherwise would not have made had they known the truth.

## JURY DEMAND

Plaintiff demands a jury.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, respectfully requests that this Court:

A.    Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), and appoint the Plaintiffs as Class and Subclasses representative and their counsel as Class counsel;

B.    Award Plaintiffs and the other members of the Class and Subclasses appropriate relief, including actual and statutory damages against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon, including: compensatory statutory

damages, and any and all other damages recoverable under law, including rescission, punitive and consequential damages;

C.      Awarding Plaintiffs and the other members of the Class and Subclasses pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

D.      Award Plaintiffs and the other members of the Class and Subclasses equitable, injunctive and declaratory relief as may be appropriate under applicable laws; and,

E.      Awarding such other and further relief as the Court may deem just and proper.

Dated:  February 6, 2018                        By:  _s/ Joshua H. Eggnatz_
                                                Joshua H. Eggnatz, Esq.
                                                **EGGNATZ | PASCUCCI**
                                                5400 S. University Drive, Ste. 417
                                                Davie, FL 33328
                                                Tel: (954) 889-3359
                                                Fax: (954) 889-5913
                                                JEggnatz@JusticeEarned.com

                                                Michael J. Klein
                                                (*Pro Hac Vice* To Be Filed)
                                                **STULL, STULL & BRODY**
                                                6 East 45th Street
                                                New York, NY 10017
                                                Telephone: (212) 687-7230
                                                Facsimile: (212) 490-2022
                                                Email: memert@ssbny.com
                                                         mklein@ssbny.com

                                                **ATTORNEYS FOR PLAINTIFFS**